Opinion of the Court.
George Thomas filed this bill, alleging that bis grandfather, Daniel White, had made his will in Virginia, and devised to his son, William White, the only child then living of his slave Betty, and the nest child that should be born, to his mother, Mary White, the slave being then pregnant, and that she had a child shortly afterwards, which was called Nursey; that said Marv White intermarried with William Thomas, and that when they went to housekeeping, they took with *178 said slave Nursey, and were in possession of her for some time; that W illiam Thomas, his father, died, Ieav- ^ compiainant his only issue, and after his death his mother returned to live with her mother, and the slave along with her, both still residing together, until they removed to Kentucky; that William White, a brother of his mother, ^administered on the estate of said William.Thomas, there being considerable personal estate; but never took any notice of the slave Nursey, as belonging to the estate, and that she continued with his mother until she married Nathaniel Floyd, who had still'held Nursey, who has now had numerous children, some of which Floyd has sold to persons acquainted with the claim. By the original and amended bills lie makes Floyd and his wrife, William White, administrator of his father, and the purchasers of the different children of Nursey, defendants and prays a settlement of the-personal estate with the administrator, and a recovery of Nursey and her children, and an account of her hire.
The administrator answered, setting forth the personal estate as shown by the inventory and sale; and alleges that the complainant lived with Floyd, and was' kept by him, and that Floyd had the personal estate in his hands, or some of it; that after the complainant came of age, he, the administrator, at the pressing solicitations of the complainant and Floyd, acted as an arbitrator between them, and settled the accounts of the estate, and made an award, to which the complainant agreed in writing, and the estate was settled accordingly
Floyd, in his answer, denies the right of the. complainant’s father to, or that he ever had possession of Nursey, and contends that she was since given to his wife, the mother of the complainant. He insists that a.court of equity will not take jurisdiction of the case; and relies on the award set up by the administrator, and the statute of limitations.
The court below dismissed the hill as to all the defendants ; and the propriety of that decree is the question now presented for our decision.
We have no doubt, that as to the administrator, so far as the bill attempted to charge him with the personal estate, it was properly dismissed. After the complainant came of age, it appears that the defendant, Floyd, *179 his step-father, claimed a part of the personal estate, as. beiog entitled thereto in right of his wife, and another' share for the maintenance and education of the complainant ; and these.matters the parties agreed to leave to the administrator, who, by a written award, decided, that the balance of the personal estate should go to Floyd, for schooling and raising the complainant; and that he, the complainant, should have no right thereto; and that the slaves, omitting entirely the family now in contest, should go to the complainant, except one old .negro woman, which was assigned to Floyd forever, in settlement of his claim therein, and Floyd should also receive twenty dollars more; and “ that, hence forward all matters of disputé relative to, or in any manner of, about or concerning the said estate, between the said complainant and Floyd, and their heirs, executors, administrators and assigns, to cease and determine; and all claim of every sort, description or land whatsoever, of either on the other, either in law or chancery, relative to the said estate^ when'the award should he agreed to and signed by both parties, should be forever- barred.” Afterwards, both the complainant and ;F!oyd signed and sealed the following agreement, at the close of the'award: “Having considered the foregoing award, acknowledge that we are therewith satisfied, per-fcctlyand well satisfied: Wherefore, we hereby agree to, and admit the same to he binding on us, our heirs, executors and administrators.”
After such an award and ratification thereof, there can he no doubt, that the right of Floyd to the balance of the personal estate, with whom the administrator accordingly settled it, was complete, unless the transaction could be impeached by mistake or fraud, which is not attempted. It is true, Floyd or the administrator had not the right of expending the principal of that cs-tate, for the maintenance and education of the complainant; but as the balance was small, it could not he more than an adequate compensation, which the complainant, then of mature age, had a right to give, and which he did give by ratifying the award. On this claim, then, he is entitled to no relief.
But the claim to Nursey and her family rests upon different grounds. It is true, this award is reli'ed on as a bar to the claim for her; but however broad the expressions used, both in the ^ward and the agreement, *180 may ke, js evident it cannot include these slaves. ^íe estai:c settled and recited, is the personal estate in the hands of the administrator, and an entirely different family of slaves, specially named iifi the award. The matters of dispute which were to cease, were “ concerning said estateand the claims which were to he “ forever barred” in law and equity, were those “ relative to said estate;” that is, the estate then settled by the arbitrator, and recited in his award, which was distinct from that now claimed. Add to this, that the administrator never did take Nursey and her family into bis possession as administrator, or treat her as belonging to the estate, and he proves in his deposition taken in the cause, that Nursey and family were not within the terms of the submission, nor was tbe claim to them at all brought into that controversy which the award decided. We, therefore, conceive that neither the award nor ratification determines any thing with regard to her title, and that the bar so strongly relied on, arising from that transaction, cannot prevail.
An heir can-a°sui?al law tor the recóv-ery of a slave assenTo/the administrator; butifthe assen/he US' may bring a suit in chim-tbc^hddei^ofas thc slave and the adjninis-trator. It -s a settJe. rule, that th» statute oflim-Rations can-a°court of law or equity, protect a inandsofhie' cestui que ■lust'
*180 1. Nor can we sustain the objection taken to the jurisdiction of a court of equity over this controversy. fj^e Ciinriot support an action at law, tó recover a slave or personal chattel belonging to his ancestor, without the assent of the executor or administrator. Woodward's heirs vs. Threlkeld, 1 Marsh. 10. But if the ad-rainistrator will not sue, it does not follow, that the heir must lose the chattel, if his title is good, and that a court eiln*W5 as lhere is no remedy at law, will not inter-Pose a1^ giVG appropriate redress. In this case, the administrator would not assent; for he never treated the slaves as part of the estate, nor would he claim them sac l* Of course, the complainan! could not recover at law; and for this reason, his application to enforce his claim, to a court of chancery, was proper, wherein he }-,as macje the administrator and holder of the estate both parties; so that if he manifested title, tbe court could supply that assent, which the administrator never would give, and decree to him the slaves at once.
The question, then, must rest on other points of de-fence, which we must investigate. We have no doubt, from the evidence, that Nursey, tbe mother of the other slaves, was the second child of Bett}r, contemplated by the devise in the will of Daniel White, grandfather of *181 the complainant 5 and if his father eve* acquired title to the slave, he must recover, unless he is barred.
The will of Daniel White, touching the disposition of the slaves in controversy, reads thus: “Moreover, my will and desire is, for my well beloved wife to have the use of negro woman Bett, while she raises three children fit to be raised without the breast; then the said negro Bett to return to my son, Daniel White, and his heirs. Item, ,1 give and bequeath to my son, William White, one of the children before mentioned is now born, named Dina; and if he lives to have an heir, if not, to be sold and equally divided between his sister, Mary White, and brother, George White, which I had by my last wife. Item, 1 give and bequeath to my daughter, Mary White” (now Mrs. Floyd,) “ before mentioned, the next child my negro Bett raises; to be divided in the same manner as the before mentioned, if she dies ■without heir. Item, I give and bequeath to my son, George White, the third child the said negro woman raises, to be divided among the survivor or survivors. Also, my desire is, that my beloved wife shall keep the said three ne-groes, until the survivors or survivor comes to the age of twenty-one. years,”
2. So far as we are able to ascertain tlie meaning of this will, the testator designed that these three slaves should pass, one to each of his respective children, William, George and Mary; and that by the word, “heir,” lie must have meant lineal descendants or children, and not collateral heirs; for such collaterals appear, both from the will and other evidence, to he numerous, he having had two wives; so that there was no probability of a lack of heirs of that character. He must also have intended, that if one or two of these his children should die without children, the survivors or survivor should hold the slaves. The custody of these slaves was, however, granted to his wife, until these three legatees should each of them arrive at the age of twenty-one years. It is somewhat doubtful, whether Mary, first the wife of Thomas, and now the wife of Floyd, at her first marriage had arrived to the age of twenty-one years; but, assuming the fact to he, that she really had arrived to that age, and that Thomas, father of the appellant, did, during the existence of the marriage relation, get into his possession the slave Nursey, in-which case she became absolutely his, and that cn his death *182 the slave remained with his widow, the question presents itself, what will be the effect of the statute of lim* itations on the claim of the appellant!
Where letters of administration had been granted in Virginia, prior to the separation, the administrator could, independent of any act of assembly of Kentucky, maintain any action here Which he could if this , country had still remained P?V of ono of the1S rights secured bytheconsti-tutl0(1'
*182 The administrator administered*in Virginia, before the separation of this state from that. About two years afterwards, the widow of Thomas and mother of the appellant removed to this state, leaving behind her the slave, Nursey, in the care of the administrator, as a friend, in order that she might be taken care of. The year following, the administrator came to this state, and brought Nursey along with him, and delivered her to the mother of the appellant, and both she and the administrator have resided here ever since. This possession of the administrator, was not as administrator; for he'had not had Nursey appraised or inserted in the inventory returned by him, as part of the estate of Thomas, the decedent; nor did he ever set up claim to, or treat her as belonging to the estate of his intestate. This removal of the administrator took place not later than the year Í794. From that time until within less than five whole years before this suit was commenced, the appellant was an infant. If this controversy was exclusively between the appellant and the administrator, there could then be no doubt that the statute would pot be a bar to the claim set up. The right of the appellant is an equitable one, and the administrator must be, during this period, considered as his trustee; and it is a settled rule, that the statute, Either in equity or at law, cannot protect a trustee against the demands of the cestui que trust.
3. It is, however, clear, that the legal right to the slave, if she belonged to the estate of the decedent, was vested in the administrator, and that he could, by any appropriate legal remedy, have recovered her from Mrs. Thomas, or from Floyd, after his intermarriage “with Mrs. Thomás. Although she went into the possession of Mrs. Thomas by consent of the administrator, yet she did not hold the slave as bailee to the administrator, but as her own; therefore, there was not such amicable possession on the one hand, as would save the statute from attaching, or such disability in the administrator, as would bring him within any of the exceptions of the statute. The only obstacle which could be plausibly set up, to his maintaining and prosecuting a suit as administrator; for the slave, is, that as his letters, *183 of administration were granted in Virginia, he could not, on them, have maintained the suit in this state. We have" an act of assembly, now in force, which au-thorises executors or administrators, constituted such in ■'other states, to sustain actions here, under certain re-strictiohs and regulations; but this act is of such modern date, that it cannot affect this controversy. But whatever may have been the law in this state, anterior to this statute, with regard to executors and administrators, constituted such by the laws of other states, there could be no difficulty with respect to those who were legally constituted such by the laws of Virginia prior to the separation; for the constitution of Kentucky, then adopted, provided, “ that all rights, actions, prose-ru cutions, claims and contracts, as well of individuals as of bodies corporate, should continue as if the said government had not been established.” It.would seem; t^, follow from this provision, that if this administrator could have sued here before the separation, he could have done it afterwards; and there was no real obstacle against a suit for the slaves, arising on this account. The result of all this is, that the statute of limitations had really run out its necessary portion of time, to. complete’the bar as between the administrator, who held the legal right of suit, and Floyd and his wife. The question, then, is, can the chancellor relieve from its effects?
limitations commences timcaus'eof* action ac-ernes, not ^intiflTwho ^ ignorant before, comes to.a kvowl-riofnsT ^
T^c?asos™ chancellor will not per-niil- the sta-until the party discovers his rights, aro where the rights themselves are purely equitable. If legal rights are pursued in a court of equity, the legal operation of the statute must prevail.
*183 4. It maybe said, that the administrator did not know his rights in this respect, and’was not acquainted with the facts which showed that the negro belonged to the estate of his intestate. Let this be admitted, and still the bar must be complete in a court of law; for the act commences there, when the cause of action accrues, and not when the plaintiff, who was ignorant before, came to the knowledge of his rights. It is true, that according to some decisions, a court of equity adopts a different rule, and especially in cases of fraud, and perhaps in others, where a part}' was wholly ignorant of, and had not the means of ascertaining his rights, that court may not permit the statute to attach, until the discovery is made and these fights become manifest, This, however, must apply to cases where the rights of the party are purely equitable, and not to cases where the legal right, in whosesoever hands it may be,.is bar\ red in a court of law. The chancellor, in such case, *184 ought not to relieve against the statute, after it has be* come a bar at law; for it would be absurd to say, that the legal claim could not be enforced at law, and yet that equity should sustain the controversy. However feeble, then, the statute may be, in the mouth of the trustee,, against his cestui que trust, it must have its appropriate effect in favor of a stranger, guilty of no fraud or concealment, as Floyd appears to be in this case, against the same cestui que trust; for if he has the advantage of the bar against the legal estate, he ought not to be stripped of it against an equity only. It follows, therefore, that the claim of the appellant against Floyd and those holding under him, for these slaves, was barred; and on this ground, the bill, as to them was properly dismissed.
An administrator cannot be made responsible for the loss of property of las intestate, occasioned by his not bringing suit until the act of limitations opposed a bar, to recovery, unless he acted with bad faith, was guilty of fraud, wilful default or gross negligence.
5. The question then remains, lias be any recourse against the administrator, for this negligence in not taking in the slave as part of the estate, not keeping her when she was in his possession, and not prosecuting suit fir her until the bar had elapsed? No doubt, an administrator or executor may be made responsible for such losses, occasioned by negligence; but to charge him, it is necessary that he should have acted with bad faith, or with some wilful default or fraud, or gross negligence. See 4 John. Ch. Rep. 419.
As to the fact, that Thomas liad the possession of this slave in his lifetime, the administrator swears in his answer, and also in a deposition taken - by the appellant himself, that he never did know that Thomas, his intestate, had held the possession of the slave; and from any testimony in the cause, it does not appear that he ever had such knowledge.1' And it is very probable, from the distance that he resided from the intestate, and the short period of time which Thomas held her, that he might remain ignorant of the fact. We have, however, no doubt that such was the fact. We do not take this, however, from the testimony of the old lady, who is the widow of the testator and mother of Mrs. Floyd, and who has given two depositions in the cause, in one of which she so flatly contradicts wbat she had stated in the other, on this very point, that we can place no reliance on either. The testimony, however, of Mrs. Floyd, who was a competent witness against the administrator, and whose deposition he took himself, and caused to be read against the objection of the opposite *185 party, is too explicit on this fact, to leave room for doubt, notwithstanding other witnesses have proved, facts conducing to negative the possession of Thomas; and one of them, adopting an adventurous mode of swearing, too common in family controversies like jthia,, has sworn to a negative, to wit, that Thomas never, had. the possession of the slave. Bqt when we admit this fact, to be true, and that the consequence was, that the slave really belonged to the proper estate of Tilomas, asdhe administrator never knew the fact, he cannot bechargr ed with such mal-conduct on, this account, as to render him responsible for the price of the slave. He must, however, have known of the will of his father; for he himself claimed, and held rights under it, and from connexion with the family, he must have known that'
Nursey.wa,s. the child bequeathed by the will to Ms .sister Mary, after she, arrived at the age ^f twenty-onj^. years,..and in the mean time directed to remain withhfiá% mother,. He also well knew of the marriage-of Thorn-as,-bis intestate, with his sister. -It may,, then, be uEg-■ed, that by law Mrs. Thomas had a vested right under will, to the slave, which, by the marriage,.so vested in-her husband, that, the right, on his death, would not survive to her, notwithstanding he never obtained possession of her, because tbe particular estate was not .determined; and that his administrator, was bound- to know the law, and must be presumed to have known it, and therefore he is inexcusable for not asserting the claim, and thereby saving the slave. This is the strongest attitude in which the case can be placed against the administrator, supposing, as we have done, that he was ignorant of his intestate’s possession.
It must he admitted to be a correct maxim, at least in a criminal case, that every intelligent man is presumed to-know the law; and on no other principle could society well exist or be governed. We yet, however, well'know, that its principles are frequently so abstruse and hard to be ascertained, as to escape the ken .of the most enlightened lawyers, and that they may be frequently convicted of palpable mistakes, in dealing in, and practising upon its principles, when it would be’cruel and unjust to impute to them such gross neg-iigepqe or impurity of motive, as to make even them responsible for culpable neglect or fraudulent intention. if such as they, ousht to be excused forsuch blun *186 ders, much fnore'oúght a plain man, as this administrator appears to be, who never seems to have made the science of law his study, from being charged with having acted with bad faith, evert if the law of this case, with regard to the right of his intestate in this slave, should turn out to be as before assumed.
Whether, as the title to this slave was vested in Mrs» Thomas, now Mrs. Floyd, before her marriage, subject to the particular estate reserved to her mother, it would so vest in her husband, on the marriage, as to descend, at his death, to his representatives; or whether it would survive to the wife, is a question on which wre do not now feel ourselves bound to express any decided opinion. We will, however, say, that it is one which, with regard to slave property, has never been directly settled by any solemn adjudication in this country. And the appellate court #of Virginia, in the case oi Wallace vs. Taliafero, 2 Call 447, has decided,* after elaborate argument and solemn deliberation, with some division among the members of that court, that even in a case where the right of the wife accrued during coverture, which is stronger than the present, the right survived to the wife, if the question is thus doubtful, or rather has been thus decided against the appellant, by a tribunal of such high authority in the state where this right first accrued, ’ if it accrued at all, surely the administrator may be acquitted of mal-administration in neglecting to contend for it.
Add to this, that it is in proof that a strong belief existed in the family, that this slave did not pass by the will, because she was not born at the time of making the wall, owing to the advice of a lawyer in that country to that effect. And although rve have come to a different conclusion, yet it is a question not free from doubt or difficulty, increased by the barrenness of authority.
Upon the whole, then, we conceive that the appellant lias not made out such a case of mal-conduct against the administrator, as to subject him to the value of these slaves; and the appellant, admitting the law to have been once in his favor, has met with what is not unusual — a loss of property, by hot, seeking it in time, or because the title thereto rvas not well understood.
The decree must, therefore; be affirmed with costs»